UNITED STATES of America

v.

Dartagnon HOWARD, Defendant.

No. CRIM.A. 97–00359.

United States District Court,
District of Columbia.

Dec. 9, 1997.

Teresa Alva, Fed. Public Defender for
D.C., Washington, DC, for Defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant's Motion to Suppress Evidence and Statements and on Defendant's Motion to Sever Counts of the Indictment. Defendant contends 1) that the search conducted by police at the site of the arrest was neither consensual nor based upon probable cause; 2) that the statement made by Defendant at the police station was in derogation of his *Miranda* rights; and 3) that the search of Defendant's bedroom at his grandmother's house was both non-consensual and in violation of his rights under the Fourth Amendment. The issues raised by Defendant present this Court with difficult questions of law under the Fourth and Fifth Amendments.

### FACTS

On August 6, 1997 at approximately 9:15 p.m., officers from the First District of the Metropolitan Police Department observed Defendant and several others with open cans of beer on the corner of Howison Place and N Street, S.W. in the District of Columbia. Section 25–128 of the District of Columbia Code makes it an arrestable offense "to drink any alcoholic beverage or possess in an open container any alcoholic beverage in any street . . . ." *See Alvarez v. United States,* 576 A.2d 713 (D.C.Cir.1990), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). As the officers approached, Sergeant Gerald G. ("G.G.") Neill observed a brown paper bag containing a gold top can within arms reach in front of the Defendant.

Sergeant Neill engaged Defendant and asked if he could search him for "guns or drugs," to which Defendant replied, "Go ahead, I'm clean." Sergeant Neill patted down Defendant and felt a hard foreign object in the left front of Defendant's pants. When asked what it was, Defendant replied, "my private parts." Defendant then tried to break free from the officers. Sergeant Neill grabbed Defendant and wrestled him to the ground. As the Defendant stood up, a plastic bag containing twelve smaller bags of crack cocaine fell from his pants leg. The Defendant was arrested. A further search turned up $147 in cash.

Defendant was taken to the police station for the purposes of booking him on drug charges. While in custody, Defendant was told by investigator Michael Fulton that he should consider "coming clean" and cooperating with the police. The officer specifically wanted to know what the Defendant could tell him about drug activity in his neighborhood. The Defendant provided the officer with no information, stating that since he had been only recently released from prison, he had no information for the police. At this point, the Defendant asked to call his grandmother, with whom he lived. Investigator Fulton dialed the number provided by Defendant and stayed right beside him as he spoke to his grandmother. At no time during Defendant's discussion with the police was the Defendant mirandized. Investigator Fulton heard Defendant state on the phone that he had been arrested for "drinking with the fellas" and that his grandmother should "tell Michelle [Defendant's girlfriend and mother of his child] to come down and get the stuff out of my room. She'll know what I'm talking about."

Immediately after overhearing this conversation, Investigator Fulton dispatched a uniform officer to secure Defendant's residence and then accompanied Sergeant Neill to the apartment located at 1401 Half Street, S.W., in the District of Columbia. On the way, Fulton called Defendant's grandmother, Carrie Morris, to notify her of their imminent arrival. She let the officers in shortly after midnight. In the premises were two other teenage grandchildren and a young great-grandchild (Defendant's daughter) who were awakened by the police officers' presence. Defendant had his own bedroom in the apartment although Ms. Morris was the sole name on the lease. There were no locks and Ms. Morris had access to enter Defendant's private room for such limited purposes as storage and cleaning. Sergeant Neill asked Ms. Morris for consent to search the premises, including Defendant's room. Neill indicated that he could obtain a search warrant, but that it would take some time and would prevent the children from going back to bed for several hours. Faced with the choices

presented to her, Morris agreed to a search of the premises.

The search uncovered additional amounts of crack cocaine in a dresser in the Defendant's room. Specifically, the police found approximately 130 individual bags containing crack, a large undivided rock of crack, two razor blades and empty ziplock bags. In a locked safe in the closet, the police found a 9mm semi-automatic pistol loaded with eight rounds of ammunition. Two additional live rounds were also found in the same safe.[1]

## ANALYSIS

### I. Initial Stop and Seizure

■ The facts indicate that there are two separate search and seizure incidents that must be addressed. The first is the initial stop and discovery of drugs on August 6, 1997. In defense of the officers' actions in this instance, the Government advances two alternative arguments. First, it contends that Defendant being in possession of an open container of alcohol constituted an arrestable offense. The Court rejects this argument on several grounds. From the facts developed at the evidentiary hearing, it is not clear that Defendant was drinking or in possession of an open can of beer at the time the police approached him. Whatever was in the container in front of the Defendant was concealed in a brown paper bag. At no time did the police remove the can from the bag. All that Sergeant Neill could verify was that the can had a gold top. Moreover, Neill testified that even if Defendant had been in possession of an open container of alcohol, he had no intention of arresting Defendant for this alleged offense.

■ Alternatively, the Government argues that the law permits the police to approach any citizen on the street and engage him in conversation. Further, officers have the right to make certain reasonable requests. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 235, 93 S.Ct. 2041, 2043–44, 2051–52, 36 L.Ed.2d 854 (1973). Of course, if permission to search an individual is requested, any agreement to undergo such a search must be voluntary and not coercive. This Court finds

that the request in this instance was proper. Nothing in the record suggests that Defendant was unduly influenced by the police. Segeant Neill testified on the stand that Defendant gave consent and nothing was presented to the contrary. The Court credits Sergeant Neill's testimony and finds that the search was consensual. In this area, no bright line can be drawn. All such situations require careful inquiry. Nonetheless, police officers must be given a certain amount of discretion to perform their public duty.

### II. Statement Made by Defendant in Police Custody

The second set of facts in this case surrounds the police search of Defendant's residence on the night of August 6, 1997. Upon arrest, Defendant was taken to the police station. Discussions ensued, where the police officers indicated that they would like Defendant to cooperate with them. As stated above, the conversation between the Defendant and police officers, while the Defendant was concededly in custody, took place without the benefit of any Miranda warning. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The conversation between the Defendant and his grandmother, which prompted the officers to proceed to the Defendant's residence, was clearly overheard by Investigator Fulton without the Defendant having been read his rights.

■ This Court finds that the statement made by Defendant in the presence of the police and the evidence thereafter obtained must be suppressed. The Court sees no reason why the Defendant was not given his Miranda rights. The Defendant was in police custody, and an officer of the department was in discussion with him. Although the officers did not formally interrogate the Defendant, the conversation that ensued between Investigator Fulton and the Defendant was for the purpose of obtaining information of criminal activity. Defendant was lured into a false sense of security because of the conversational tone of the discussion. This Court finds that the conversations between

---

1. The Defendant was not charged in the indictment with any gun violations.

the Defendant, the police, and his grand-mother must be suppressed, having occurred without the benefit of any *Miranda* warning.

### III. *Search and Seizure of Defendant's Residence*

With respect to the evidence found in Defendant's bedroom at his grandmother's house, the Government concedes that Defendant had standing to raise a Fourth Amendment claim. Although the grandmother, Ms. Morris, was the sole name on the lease, the apartment was Defendant's permanent residence and the bedroom in question was in essence his.

■ While the record shows that Ms. Morris did consent to the police search, this Court finds that the consent was not freely given. She testified on the stand that she initially refused to grant consent. She claimed that the police responded by telling her that if they had to get a warrant, it would be some time before the premises would be restored to their normal condition and the children permitted to return to their beds. Concerned for the children, one of whom was an honor student who had school early the next morning, and because she "had nothing to hide," she signed the form.

■ Even if the consent granted by Ms. Morris was in fact voluntary, such consent could not be construed to include Defendant's private bedroom. *See United States v. Whitfield*, 939 F.2d 1071 (D.C.Cir.1991). Ms. Morris testified on the stand that Defendant pays part of the rent for the apartment. The bedroom in question is essentially his, and the expectation is that no other member of the family is to enter without some valid, explicit reason. Defendant had a genuine privacy interest in his own individual bedroom that his grandmother could not waive without his consent.

It is clear that the way the police should have proceeded in the case was to obtain a search warrant. There were no exigent circumstances that required the police to cut corners. On several occasions, this Court has commended police officers for utilizing a procedure for obtaining a search warrant on an expedited basis under facts similar to those in this case. *See, e.g. United States v. Carlos Mason*, No. 94–240. The way the procedure works is as follows: Once the police officers have secured the premises, a phone call is made to an emergency duty Assistant U.S. Attorney who obtains the facts and proceeds to get a search warrant expeditiously. Of course, if the Assistant U.S. Attorney finds that exigent circumstances exist for a warrantless search, approval for an immediate search can be given.

This Court cannot understand why the police fail to utilize this recognized process. No exigency of circumstances is evident from the record as to why the police chose to bypass this procedure, take shortcuts and proceed as they did. The evidence obtained from the residence on 1401 Half Street, S.W. on the night of August 6, 1997 will be suppressed.

### IV. *Severance of Counts*

■■ As for Defendant's Motion to Sever the Counts of the Indictment, the first part of his motion, to sever the two separate drug counts, is rendered moot by this Court's opinion on the issue above. As for the second part of Defendant's motion, to sever the escape and assault counts from the drug count, this Court finds that these counts all arose from the same set of facts incident to the initial stop and search of Defendant on August 6, 1997. Given the intertwining set of events that lead to both charges, even if this Court were to grant separate trials for each count, the same evidence would surely be alluded to at trial. Thus, this Court denies Defendant's remaining Motion to Sever.